[Cite as *State ex rel. Fought v. Indus. Comm. of Ohio*, 2026-Ohio-825.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Jason B. Fought, | : | |
| Relator, | : | No. 24AP-706 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio et al., | : | |
| Respondents. | : | |

---

D E C I S I O N

Rendered on March 12, 2026

---

**On brief:** *Larrimer and Larrimer*, and *Thomas L. Reitz*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Justin Marshall*, for Industrial Commission of Ohio.

**On brief:** *Barnes & Thornburg LLP*, and *Samatha Pugh*, for CFA Staffing.

---

IN MANDAMUS
ON RELATOR'S OBJECTIONS

MENTEL, J.

{¶ 1} Relator, Jason B. Fought, brings this original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its denial of his application for permanent total disability compensation and to issue an order granting such compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court. On November 25, 2025, the magistrate issued the appended decision, including findings of fact and conclusions of law, recommending we deny Fought's request for a writ of mandamus. The magistrate found

that "Fought has not demonstrated the commission abused its discretion in making its findings regarding Fought's 'vocational potential' since some evidence supported those findings." (Appended Mag.'s Decision at 24.)

{¶ 3} On December 2, 2025, Fought filed objections to the magistrate's decision. After a brief extension of time, the commission and respondent CFA Staffing filed memorandums in opposition to Fought's objections on December 29, 2025 and January 5, 2026, respectively.

{¶ 4} Pursuant to Civ.R. 53(D)(4)(d), we undertake an independent review of the objected matters "to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." We may adopt or reject a magistrate's decision in whole or in part, with or without modification.

{¶ 5} Fought first objects to the magistrate's decision writing, "[t]he Magistrate improperly held that the Commission was within it's right as the evaluator of factual evidence to conclude that there is no vocational preclusion to re-training or skills enhancement to increases the injured workers vocational potential." (Internal quotation omitted.) (Relator's Obj. at 2.)

{¶ 6} Upon review, we find Fought's objection without merit. As set forth in the magistrate's decision, the Supreme Court of Ohio has held that "the commission, as the exclusive evaluator of disability, is not required to accept vocational evidence, even if uncontroverted." *State ex rel. Lacroix v. Indus. Comm.*, 2015-Ohio-2313, ¶ 14. As such, the commission, as the expert on vocational evidence, may accept or reject a vocational report. *Id.* Thus, the commission does not abuse its discretion if its order is based on some evidence in support of its findings.

{¶ 7} Here, the magistrate acknowledged that in October 2023, the commission found vocational rehabilitation services were not feasible for Fought because there was not a reasonable probability that such services would result in him returning to work. (Appended Mag.'s Decision at 24.) The commission's subsequent order denying Fought's application for permanent total disability compensation, however, found that Fought does have the physical capacity to return to light level employment writing there is no vocational preclusion to re-training or skills enhancement to increase his vocational potential. While these findings are at odds with each other, the magistrate aptly points out that Fought "does

not explain why the commission could not reach a different conclusion in July 2024 based on the evidence presented with regard to Fought's application for permanent total disability compensation. And, indeed, some evidence and sufficient analysis supports the staff hearing officer's findings regarding Fought's 'vocational potential' in the July 9, 2024 order." (Appended Mag.'s Decision at 23.) The magistrate highlighted some of the various medical and non-medical factors, *see* Appended Mag.'s Decision at 23-25, provided by the staff hearing officer, which formed the basis for the different conclusion. As such, we agree with the magistrate that there is some evidence to support the commission's findings concerning Fought's vocational potential.

{¶ 8} Fought also takes issue with the commission's purported failure "to consider the psychological limitations noted by Dr. Shuman, when determining that Fought was able to return to sustained remunerative employment." (Relator's Obj. at 8.) The magistrate correctly noted that Fought's arguments parallel those made by the claimant, and subsequently rejected by the Supreme Court, in *State ex rel. Urban v. Wano Expiditing, Inc.*, 2025-Ohio-3009. The record reveals that the staff hearing officer reviewed and summarized the reports of Drs. Onamusi, Shuman, and Ravin. The magistrate found that, like *Urban*, the staff hearing officer's reliance on these reports necessarily shows—at the very least, implicitly—that the staff hearing officer considered the physical and psychological conditions. "The staff hearing officer identified Fought's physical and psychological conditions and relied on reports opining on both the physical and psychological restrictions." (Appended Mag.'s Decision at 21.) We agree with the magistrate that these facts provide adequate assurances that the staff hearing officer appropriately considered the psychological condition in conjunction with the physical conditions when reaching the decision that Fought's permanent total disability application should be denied. (Appended Mag.'s Decision at 23.)

{¶ 9} Upon review of the magistrate's decision, an independent review of the record, and due consideration of Fought's objections, we find the magistrate has properly determined the pertinent facts and applied the law. Therefore, we overrule Fought's objections and adopt the magistrate's decision, including the findings of fact and conclusions of law. Accordingly, we deny Fought's writ of mandamus.

*Objections overruled*;
*writ of mandamus denied.*

DORRIAN and LELAND, JJ., concur.

_____

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Jason B. Fought, | : | |
| Relator, | : | |
| v. | : | No. 24AP-706 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on November 25, 2025

*Larrimer and Larrimer*, and *Thomas L. Reitz*, for relator.

*Dave Yost*, Attorney General, and *Justin Marshall*, for respondent Industrial Commission of Ohio.

*Barnes & Thornburg LLP*, and *Samantha Pugh*, for respondent CFA Staffing.

IN MANDAMUS

{¶ 10} In 2023, relator Jason B. Fought applied for permanent total disability compensation in his workers' compensation claim. Respondent Industrial Commission of Ohio ("commission") denied Fought's application on the basis that he had the physical capacity to return to employment at a light-work level and consideration of nonmedical disability factors. Fought now requests a writ of mandamus ordering the commission to vacate its denial of his application for permanent total disability compensation and to issue an order granting such compensation. For the following reasons, the magistrate recommends denying Fought's request for a writ of mandamus.

## I. Findings of Fact

{¶ 11} 1. Fought was injured on August 2, 2011 through his employment with respondent CFA Staffing when he was struck on his right side by a falling box. Fought's workers' compensation claim was ultimately allowed for the following conditions: sprain rectus abdominis, abdominal wall; abdominal hematoma; lower right abdomen tissue infection; complex regional pain syndrome type I; somatic symptom disorder; complex regional pain syndrome of the abdomen; left upper extremity complex regional pain syndrome; reflex sympathetic dystrophy right upper extremity; reflex sympathetic dystrophy right face; reflex sympathetic dystrophy right eye.

{¶ 12} 2. Fought underwent several surgical procedures related to his allowed conditions including multiple procedures related to the placement or removal of spinal cord stimulators.

{¶ 13} 3. Michael Salerno, PT, conducted a functional capacity evaluation of Fought on March 16, 2023 and issued a report on the same day. Salerno found that Fought fell "within the Sedentary Work Classifications for Material Handling Activities" as Fought demonstrated "decreased dexterity completing fine motor tasks and difficulty with gross motor activities causing increased pain." (Stip. at 76.)

{¶ 14} 4. Rita P. Calhoun, MA, CRC, issued a vocational rehabilitation peer review report dated June 27, 2023. Calhoun noted that in the March 16, 2023 functional capacity evaluation, "[t]here was no testing that indicated [Fought's] ability to perform frequent to constant sitting and use of his upper extremities." (Stip. at 246.) While acknowledging the functional capacity evaluation "report indicates [Fought] is functioning in the sedentary physical demand level," Calhoun found that "details in the report negate the stated functional level." *Id.* According to Calhoun, a vocational rehabilitation case manager who was assigned to Fought's case on May 19, 2023 "opined that Mr. Fought is not a good candidate for participation in a vocational rehabilitation plan with the goal of returning to work." *Id.* Despite Fought's indication that he "would like to return to work for personal and financial reasons," the vocational rehabilitation case manager found the "totality of his limitations and symptoms [were] work prohibitive," and closed the vocational rehabilitation file due to poor feasibility. *Id.* In response to being asked whether the determination to close the case plan was appropriate, Calhoun responded: "Yes, based on

the information obtained by the [vocational rehabilitation case manager] and the documentation provided, [Fought] is not a feasible candidate for vocational rehabilitation services. Closure of the vocational rehabilitation file was appropriate." *Id.* at 247. Calhoun recommended that the rehabilitation file remain closed.

{¶ 15} 5. A commission staff hearing officer conducted a hearing on October 12, 2023 on the issue of whether Fought's vocational rehabilitation file should be closed. In an order issued on October 14, 2023, the staff hearing officer found Calhoun's June 27, 2023 report and opinion to be persuasive. The staff hearing officer noted Calhoun's opinion that the details of the functional capacity evaluation conducted by Salerno "negate the identified functional level of sedentary." (Stip. at 82.) The staff hearing officer found sufficient persuasive evidence to establish that vocational rehabilitation services were not feasible for Fought because there was not a reasonable probability that such services would result in Fought returning to work. As a result, the staff hearing officer found closure of Fought's vocational rehabilitation file was appropriate.

{¶ 16} 6. Fought filed an application for permanent total disability compensation (also known as an "IC-2") on December 7, 2023. Fought's application was supported by the August 13, 2023 letter of Aaron LaTurner, Ph.D., and the November 14, 2023 report of Donato Borrillo, M.D., J.D.

{¶ 17} 7. In the August 13, 2023 letter, Dr. LaTurner stated that Fought began receiving treatment in February 2014 after the allowance of the psychological condition of somatic symptom disorder. Though the commission found Fought had reached maximum medical improvement with regard to that condition, Fought continued to receive behavioral and supportive treatment with Dr. LaTurner.

{¶ 18} With regard to Fought's condition, Dr. LaTurner stated that Fought had "a low frustration tolerance" and was "easily overwhelmed." (Stip. at 92.) Fought was not sleeping well and continued to "experience significant variability in his moods." *Id.* Furthermore, Dr. LaTurner stated that "Fought's pain remains poorly controlled, the focus of his attention and presentation exacerbating and maintaining his psychological difficulties." *Id.* Dr. LaTurner found that Fought's "ability to understand, carry[ ]out and remember instructions, maintain concentration and attention, manage work stressors, and respond appropriately to supervision, coworkers, or interact with the public would be

limited." *Id.* As a result, Dr. LaTurner opined that Fought would be unable to engage in sustained remunerative employment and was permanently and totally disabled as a result of his allowed condition of somatic symptom disorder.

{¶ 19} 8. Dr. Borrillo conducted a physical examination of Fought on October 30, 2023. In the November 14, 2023 report, Dr. Borrillo summarized the history of Fought's injury and treatment and the results of the physical examination. Dr. Borrillo opined that Fought was permanently and totally disabled based solely on the allowed conditions in the claim and discussed the impact of Fought's allowed conditions. Dr. Borrillo stated that the allowed conditions of reflex sympathetic dystrophy right face and eye and complex regional pain syndrome type I prevented Fought from performing remunerative employment and returning to his former position of employment. Due to these conditions, Dr. Borrillo found Fought was "unable to focus, remain on task, or work one ore more hours without respite." (Stip. at 96.) Additionally, Fought was "unable to work at heights, climb, or drive commercially." *Id.* Dr. Borrillo found that the conditions of sympathetic dystrophy right upper extremity and left upper extremity complex regional pain syndrome limited Fought to "lifting less than 10 or more pounds." *Id.* at 97. Dr. Borrillo stated that Fought was "unable to perform bimanual labor" and "unable to perform sedentary work." *Id.*

{¶ 20} 9. After his application was submitted, Fought was examined at the request of the commission by three specialists: Babatunde T. Onamusi, M.D., Joshua Shuman, Psy.D., and James G. Ravin, M.D.

{¶ 21} 10. On January 31, 2024, Dr. Onamusi conducted a physical examination of Fought with regard to the allowed physical conditions, with the exception of the physical condition of reflex sympathetic dystrophy right eye. In a commission specialist report completed on the same date, Dr. Onamusi summarized the history of the present condition, current reported symptoms, Fought's subjective report of the impact of the allowed conditions on activities, and the results of the physical examination. Next, Dr. Onamusi provided opinions in response to three questions posed by the commission.

{¶ 22} First, Dr. Onamusi found that Fought had reached maximum medical improvement for each of the allowed physical conditions. Second, Dr. Onamusi provided an estimated percentage of whole person impairment arising from each allowed condition. Dr. Onamusi found a zero percent impairment for the conditions of sprain rectus

abdominis, abdominal wall; abdominal hematoma; and lower right abdomen tissue infection. Dr. Onamusi noted that "[t]hese are self-limiting soft tissue conditions that based on physical examination there are no residual impairments." (Stip. at 178.) Dr. Onamusi found a 3 percent impairment for the conditions of complex regional pain syndrome type I; complex regional pain syndrome of the abdomen; and reflex sympathetic dystrophy right face. For the condition of left upper extremity complex regional pain syndrome, Dr. Onamusi found a 3 percent impairment. Finally, for the condition of reflex sympathetic dystrophy right upper extremity, Dr. Onamusi found a 5 percent impairment. As a result, Dr. Onamusi found a combined whole person impairment of 11 percent.

{¶ 23} Third, Dr. Onamusi summarized Fought's residual functional capacity resulting from the impairment associated with the evaluated physical conditions as follows: "Sit frequently, stand, or walk occasionally, bend or squat occasionally, and use the upper extremities for gross and fine motor tasks frequently. [Fought] is capable of exerting up to 20 lbs. force occasionally and is capable of pulling and pushing 5-10 lbs. occasionally." (Stip. at 180.) "Based on treatment received, and response to treatment and effects of the injury on his activities of daily living," Dr. Onamusi concluded that Fought was "capable of sustaining remunerative activity in the light work capacity." *Id.* In a physical strength rating form attached to the report, Dr. Onamusi indicated Fought was capable of work in the physical demand category of light work and referred to the report for restrictions.

{¶ 24} 11. On February 22, 2024, Dr. Shuman conducted a psychological evaluation of Fought with regard to the allowed psychological condition of somatic symptom disorder. In a report dated March 5, 2024, Dr. Shuman provided a summary on a number of topics including Fought's history of the present condition, review of past treatment, and current reported symptoms arising from the allowed psychological condition. Dr. Shuman reported the results of a mental status evaluation, including observed or tested cognition, insight, and judgment. Dr. Shuman also reviewed and summarized the four functional areas. Next, Dr. Shuman responded to three questions posted by the commission.

{¶ 25} First, Dr. Shuman found Fought was at maximum medical improvement with regard to the allowed psychological condition. Second, Dr. Shuman provided the class and percentage of whole person impairment due to the allowed psychological condition in each of the four functional areas as follows: for activities of daily living or typical day, a class 2,

mild impairment of 20 percent; for social functioning, a class 2, mild impairment of 20 percent; for concentration, persistence, and pace, a class 2, mild impairment of 20 percent; and for adaptation, a class 3, moderate impairment of 30 percent. From the four functional areas, Dr. Shuman found Fought had a combined whole person impairment of 23 percent due to the allowed psychological condition alone.

{¶ 26} Third, with regard to Fought's residual functional capacity related to the allowed psychological condition, Dr. Shuman concluded that Fought was "functioning well enough to work at this time" based on Dr. Shuman's review of records and Fought's self-report. (Stip. at 172.) Dr. Shuman noted that "[w]hile [Fought] struggles with fatigue and lowered self-esteem, by his self-report, those symptoms only occasionally cause occasional and [m]ild impairment." *Id.* Additionally, Dr. Shuman noted that "[w]hile [Fought] reported suffering from depressed moods daily, he is able to complete all important functions of [a]ctivities of [d]aily [l]iving without difficulty." *Id.* As a result, Dr. Shuman found Fought was not prohibited from work due solely to his psychological impairment previously allowed in this claim with limitations noted on the occupational activity assessment. In the occupational activity assessment attached to the report, Dr. Shuman indicated Fought was capable of work with the following limitations: "(1) working no more than 6 hours per day, 5 days per week due to fatigue, (2) not working directly with customers due to irritability, and (3) a position that allows him extra breaks when suffering from pain from his allowed physical conditions." *Id.* at 173.

{¶ 27} 12. On March 22, 2024, Dr. Ravin, conducted an ophthalmological examination of Fought with regard to the allowed condition of reflex sympathetic dystrophy right eye. In a commission vision specialist report, Dr. Ravin provided a brief summary of the history of Fought's present condition, current reported symptoms, and subjective report of the impact of the allowed condition on activities. Dr. Ravin also summarized the results of the examination. Next, Dr. Ravin responded to three questions posed by the commission. First, Dr. Ravin stated that Fought had reached maximum medical improvement for the evaluated allowed condition. Second, Dr. Ravin found Fought had a zero percent whole person impairment arising from the allowed condition. Third, Dr. Ravin found that there was no limitation in functional capacity of the eye and no need for

restrictions since there was no finding of impairment. In a residual function assessment form attached to the report, Dr. Ravin indicated that Fought had no work limitations.

{¶ 28} 13.  Having been informed that Fought "was participating in physical activity outside of what was reported on his application for Permanent Total Disability benefits," the Bureau of Workers' Compensation ("bureau") Special Investigations Department conducted an investigation and issued a report dated May 29, 2024. (Stip. at 253.) In the report, the special investigations department provided findings from its review of Fought's social media and surveillance of Fought. The special investigations department contrasted the results of its investigation with Fought's application for permanent total disability and medical reports. Based on its findings, the special investigations department concluded that Fought "actively participated in regular physical activity which was not reported on his application for permanent total disability nor was this activity reported to examination physicians." *Id.* at 256. According to the report, the "information provided on [Fought's] application for permanent total disability and attached examination reports specifically noted no involvement with clubs or associations, a limited ability to interact with the public, and painful and limited range of motion in the wrist, elbow, and shoulder." *Id.* Though "[s]ubsequent examinations ordered by the [commission] reported [Fought] had detailed an inability to leave his house four days a week, no exercise, and no hobbies," the special investigations department found that "evidence . . . showed [Fought's] active participation in regular physical activity, with the only break in this activity due to health conditions unrelated to his claim allowances. *Id.*

{¶ 29} 14. A hearing on Fought's application for permanent total disability compensation was held by a commission staff hearing officer on June 12, 2024. In an order issued July 9, 2024, the staff hearing officer denied Fought's application for permanent total disability. The staff hearing officer reviewed the history of Fought's injury, treatment, and workers' compensation claim. Next, the staff hearing officer summarized the reports of the commissions' specialists—Drs. Onamusi, Shuman, and Ravin.

{¶ 30} With regard to Dr. Onamusi's report, the staff hearing officer noted Dr. Onamusi's opinion that Fought "was able to return to sustained remunerative employment at a light level capacity." (Stip. at 110.) With regard to Dr. Shuman's report, the staff hearing officer stated:

> Dr. Shuman opined [Fought] had reached maximum medical improvement for the allowed psychological condition and assessed a 23 percent whole person impairment, based solely on the allowed psychological condition. Dr. Shuman indicated [Fought] was capable of working six hours per day, five days per week, no direct contact with customers due to irritability, and in a position that allowed extra breaks when suffering from pain related to the allowed conditions.

*Id.* The staff hearing officer also noted Dr. Ravin's opinion that Fought "had no work limitations due to the condition, right eye reflex sympathetic dystrophy." *Id.* Having reviewed the findings in the commission specialists' reports, the staff hearing officer found the specialists to be persuasive that Fought was "at maximum medical improvement for all the allowed conditions." The staff hearing officer also found Drs. Onamusi and Shuman to be persuasive that Fought was "unable to return to his former position of employment due to residuals from the industrial accident," but "could potentially return to work within his restrictions." *Id.*

{¶ 31} Because Fought was unable to return to work at his prior position of employment, but could potentially perform sustained remunerative employment with restrictions, the staff hearing officer considered not only Fought's medical impairments, but his age, education, work record and other relevant nonmedical factors. The staff hearing officer noted Fought was 46 years of age at that time. With regard to education, the staff hearing officer found that although Fought had not graduated from high school or obtained a GED, Fought had obtained a commercial driver's license, was a certified welder, and was able to read, write, and do basic math. Though Fought reported not having basic computer skills, the staff hearing officer found Fought had reported being able to type frequently and was "able to communicate on FaceBook using his cellular device, including typing and taking photographs." (Stip. at 111.) The staff hearing officer reviewed Fought's work history from 2003 onward, noting that Fought had performed welding and used basic hand tools to perform medium-work job activities. Additionally, the staff hearing officer found Fought had been employed in a supervisory capacity during all his employment and had trained other workers.

{¶ 32} Next, the staff hearing officer made findings regarding the May 29, 2024 report of the bureau special investigations department. The staff hearing officer noted the

argument of the bureau's counsel that the investigation began because "an allegation was received [Fought] was participating in physical activity that was inconsistent with what he reported on his IC-2, and [Fought] did not document that he participated in corn hole events on his IC-2, nor report his activity during examinations completed by his own providers or the Commission's specialists." *Id*. The staff hearing officer summarized Fought's testimony regarding the findings in the report as follows:

> [Fought] testified he began participating in corn hole events during Covid because it was a way for him to engage with others and get out of the house. [Fought] testified the events were in St. Marys and it was a small group of people he knows, totaling about 15 to 20 people. [Fought] testified the bean bag weighs about one pound and it is tossed to a tilted board approximately 27 feet away. [Fought] testified he did not always participate in the games and that was why he was not pictured in all the photographs. [Fought] testified some of the corn hole events he attended, he took the photos that were posted on FaceBook. [Fought] further testified he did not participate in Singles events because it was too much walking. He explained he played on a team with one other person because he did not have to walk back and forth between the corn hole boards. [Fought] further testified each game lasted about eight to 10 minutes, he was able to sit for a minute if he needed to rest, and there were three games in a tournament.

*Id*.

{¶ 33} Having noted the report and reviewed Fought's testimony, the staff hearing officer found Fought "did not provide a sufficient reason for not disclosing his corn hole hobby." (Stip. at 111.) The staff hearing officer found Fought "was not forthcoming about extent of his corn hole activity to the Commission or to the Commission Specialists." *Id*. Stating that "the evidence contained in the Report inconsistent with what [Fought] reported to the Commission Specialists and his testimony at today's hearing," the staff hearing officer continued:

> The Staff Hearing Officer finds [Fought] reported to Dr. Onamusi he was only able to drive or ride about 20 miles. The Staff Hearing Officer finds on pages seven through nine in the Report, [special investigations] documents pages 351 through 400, a list of events in which [Fought] participated. The Staff Hearing Officer finds the events were held in the following Ohio cities: Bellefontaine, New Bremen, Wapakoneta, Lima, Huber Heights, Rockford, Tiffin, Mt.

Cory, and Celina. Additionally, [Fought] participated in a corn hole tournament in Brighton, Michigan. Furthermore, the Staff Hearing Officer finds [Fought] was evaluated by Dr. Ravin in Toledo on [March 22, 2024] and attended the Brighton, Michigan event the next day, on [March 23, 2024], but reported to Dr. Ravin, he did not have any hobbies.

The Staff Hearing Officer finds [Fought] testified he did not participate in Singles events because it was too much walking. However, the Staff Hearing Officer finds page 48 of 50, SIU documents pages 201 through 250 and page 32 of 50, SIU documents 301 through 350, demonstrated [Fought] participated in Singles events.

The Staff Hearing Officer finds [Fought] reported to Dr. Onamusi on [January 31, 2024] he did not have any hobbies, but the Report documented [Fought] participated in a corn hole event the evening of [January 31, 2024] and before the examination by Dr. Onamusi, on [January 29, 2024]. The Staff Hearing Officer finds [Fought] told Dr. Shuman on [February 22, 2024], he visited with friends frequently. Dr. Shuman quoted [Fought], " 'I go to the bowling alley and watch them bowl, but I hardly ever leave the house.' " The Staff Hearing Officer finds [Fought] was at a corn hole event on [February 20, 2024], [February 22, 2024] and [February 24, 2024].

(Stip. at 111-12.)

{¶ 34} Next, the staff hearing officer summarized Fought's testimony with regard to his complex regional pain syndrome. Fought testified that he had "good days and bad days," with his ability level depending on whether his complex regional pain syndrome was flaring up. (Stip. at 112.) On good days, Fought was "able to engage in activities around the house, such as house cleaning and doing dishes." *Id.* On bad days, Fought stated he "usually ends up in the emergency room due to loss of blood." *Id.* Fought explained he "usually stays on the couch when he is having a bad day" and estimated he had "about 15 bad days each month." *Id.* rehabilitation services several times but never participated in services. A 2013 vocational rehabilitation closure report reflected case closure due to "lack of support from the physician of record." *Id.* Another closure in 2014 was due to "medical instability." *Id.* Finally, the staff hearing officer noted the 2023 commission order finding vocational rehabilitation services were not feasible for Fought.

{¶ 35} Next, the staff hearing officer analyzed and weighed the nonmedical factors. First, the staff hearing officer found Fought's age was a positive factor, as he had "many productive years during which he could be involved in sustained remunerative employment, even on a part-time basis." (Stip. at 112.) Second, education was found to be a neutral factor based on a finding that Fought had "sufficient basic skills for entry level employment and the capacity to acquire new job skills either through retraining or on-the-job training." *Id.* The staff hearing officer noted Fought's computer skills based on his ability to "type and upload photos to the Internet." *Id.* Further, the staff hearing officer noted Fought's communication skills based on his prior employment in a supervisory capacity, as well as a finding that "many of the screen shots contained in the Report of Investigation demonstrated [Fought's] responsiveness to others and his ability to relay information." *Id.*

{¶ 36} Third, Fought's employment history was found to be a neutral factor since Fought's employment was "not varied" but did include employment in a supervisory capacity throughout his employment history. (Stip. at 112.) The staff hearing officer found Fought "would have developed skills to coordinate tasks, delegate responsibilities, monitor progress and assess the quality of the job performance by others." *Id.* Fought also "would have developed leadership skills and had the ability to motivate and empower others, facilitate and manage group interactions and communicate effectively with others to achieve goals and activities." *Id.* Noting Fought's history training other employees, the staff hearing officer found Fought "would have developed skills to help others gain knowledge and learn new things." *Id.* at 113.

{¶ 37} In conclusion, the staff hearing officer found "sufficient persuasive evidence to support [Fought] has the physical capacity to return to light level employment, and his education and work history are assets rather than barriers to performing work at a light level." *Id.* The staff hearing officer also concluded there was "no vocational preclusion to re-training or skills enhancement to increase [Fought's] vocational potential." *Id.* As a result of these findings, the staff hearing officer denied Fought's application for permanent total disability compensation.

{¶ 38} 15. Fought filed a request for reconsideration of the July 9, 2024 staff hearing officer's order.

{¶ 39} 16. On August 9, 2024, the commission issued an order denying Fought's request for reconsideration.

{¶ 40} 17. Fought commenced this action in mandamus with the filing of his complaint on November 26, 2024.

## II. Discussion and Conclusions of Law

{¶ 41} Fought asserts entitlement to a writ of mandamus ordering the commission to vacate its denial of his application for permanent total disability compensation and to issue an order awarding him such compensation. In the alternative, Fought requests a writ of mandamus remanding this matter for further proceedings before the commission in accordance with law.

## A. Requirements for Mandamus

{¶ 42} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, Fought must establish a clear legal right to the requested relief, that the commission has a clear legal duty to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). "A writ of mandamus may lie when there is a legal basis to compel the commission to perform its duties under the law or when the commission has abused its discretion in carrying out its duties." *State ex rel. Cassens Corp. v. Indus. Comm. of Ohio*, 2024-Ohio-526, ¶ 10.

{¶ 43} With regard to legal questions, a writ of mandamus " 'may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law.' " *Id.*, quoting *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65 (1975). With regard to factual determinations, where there is no evidence upon which the commission could have based its factual determination, the commission has abused its discretion and the issuance of a writ of mandamus is appropriate. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981). *See State ex rel. Johnson v. Indus. Comm.*, 11 Ohio App.3d 22, 23 (10th Dist.1983) ("For more than fifty years, the 'some-evidence' rule, although not always referred to by that name, has been recognized as the rule to be applied in determining whether there has been an abuse of discretion with respect to factual matters."). Furthermore, in all matters affecting the rights and obligations of the claimant or employer,

the commission must specifically state what evidence has been relied upon and briefly explain the reasoning for its decision. *See State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991), at syllabus; *State ex rel. Yellow Freight Sys. v. Indus. Comm.*, 71 Ohio St.3d 139, 142 (1994).

## B. Permanent Total Disability

{¶ 44} "[T]he purpose of permanent and total disability benefits is to compensate injured persons for impairment of earning capacity." *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167, 170 (1987), citing *State ex rel. Gen. Motors Corp. v. Indus. Comm.*, 42 Ohio St.2d 278 (1975). Permanent total disability is the inability to do any sustained remunerative employment due to the allowed conditions in the claim. *See State ex rel. Schultz v. Indus. Comm.*, 2002-Ohio-3316, ¶ 61, citing *Stephenson* at 170; Adm.Code 4121-3-34(B)(1). Compensation for permanent total disability is governed by R.C. 4123.58, which allows compensation only when one of the following conditions is met:

> (1) The claimant has lost, or lost the use of both hands or both arms, or both feet or both legs, or both eyes, or of any two thereof; however, the loss or loss of use of one limb does not constitute the loss or loss of use of two body parts;
>
> (2) The impairment resulting from the employee's injury or occupational disease prevents the employee from engaging in sustained remunerative employment utilizing the employment skills that the employee has or may reasonably be expected to develop.

R.C. 4123.58(C). Work is considered "sustained" under R.C. 4123.58(C) when it "consists of an ongoing pattern of activity." *State ex rel. Bonnlander v. Hamon*, 2017-Ohio-4003, ¶ 15. To be considered sustained, the work need not be regular or daily; rather, it may be intermittent, occasional, or even part-time. *Id.*

{¶ 45} Circumstances prohibiting compensation for permanent total disability are contained in R.C. 4123.58(D), which provides as follows:

> Permanent total disability shall not be compensated when the reason the employee is unable to engage in sustained remunerative employment is due to any of the following reasons, whether individually or in combination:
>
> (1) Impairments of the employee that are not the result of an allowed injury or occupational disease;

(2) Solely the employee's age or aging;

(3) The employee retired or otherwise is not working for reasons unrelated to the allowed injury or occupational disease.

(4) The employee has not engaged in educational or rehabilitative efforts to enhance the employee's employability, unless such efforts are determined to be in vain.

R.C. 4123.58(D).

{¶ 46} Adm.Code 4121-3-34 contains definitions, requirements, and procedures for the adjudication of applications for permanent total disability compensation. Definitions pertaining to the classification of physical demands of positions of employment are found in Adm.Code 4121-3-34(B)(2).

{¶ 47} If the commission finds the claimant is medically incapable of returning to the former position of employment, but may be able to engage in sustained remunerative employment, commission must also consider nonmedical disability factors. Adm.Code 4121-3-34(D)(2)(b). Nonmedical factors include: "the injured worker's age, education, work record, and all other factors, such as physical, psychological, and sociological, that are contained within the record that might be important to the determination as to whether the injured worker may return to the job market by using past employment skills or those skills which may be reasonably developed." *Id. See Stephenson*, 31 Ohio St.3d at 173 (setting forth the nonmedical disability factors, which are commonly referred to as "*Stephenson* factors"). Thus, even where the injured worker is medically capable of employment, permanent total disability compensation may still be awarded based on the nonmedical disability factors. *See State ex rel. Kidd v. Indus. Comm.*, 2023-Ohio-2975, ¶ 20.

{¶ 48} Where a claim contains an allowed psychiatric or psychological condition and the injured worker retains the physical ability to engage in some sustained remunerative employment, the commission "shall consider whether the allowed psychiatric condition(s) in combination with the allowed physical condition(s) prevents the injured worker from engaging in sustained remunerative employment." Adm.Code 4121-3-34(D)(3)(i). *See State ex rel. Urban v. Wano Expiditing, Inc.*, 2025-Ohio-3009, ¶ 26; *State ex rel. Guy v. Indus. Comm.*, 2009-Ohio-2553, ¶ 27 (10th Dist.).

**C. Analysis**

{¶ 49} Fought asserts the commission's denial of his request for permanent total disability compensation was an abuse of discretion for two reasons. First, Fought contends the commission abused its discretion by denying Fought's application without specifying his residual functional capacity when considering both his physical and psychological limitations. In making this argument, Fought relies on a decision of this court that has, since briefing concluded in this matter, been reversed by the Supreme Court of Ohio. *See Urban*, 2025-Ohio-3009.

{¶ 50} In *Urban*, a worker's compensation claimant sought a writ of mandamus, arguing that because his claim included allowed psychological conditions and a commission staff hearing officer had found him physically able to work, Adm.Code 4121-3-34(D)(3)(i) required the staff hearing officer to separately consider his ability to work based on the combination of limitations relating to his physical and psychological conditions. By merely concluding that the claimant was able to return to work "with limitations contained in the doctors' reports," the claimant argued the staff hearing officer supplied insufficient reasoning, especially considering the failure to fully identify the extent of the psychological limitations imposed in a doctor's report. *Urban* at ¶ 24. This court agreed and granted a writ of mandamus compelling the commission to vacate its order denying the claimant's application for permanent total disability compensation and enter a new order adjudicating the application in a manner consistent with the opinion of this court.

{¶ 51} On appeal, the Supreme Court of Ohio reversed, finding that although the staff hearing officer "did not cite Adm.Code 4121-3-34(D)(3)(i) or quote the operative language from that administrative rule," the staff hearing officer's order "sufficiently establishes that she considered [the claimant's] psychological conditions in combination with his physical conditions before concluding that he could engage in sustained remunerative employment." *Id.* at ¶ 26. The staff hearing officer "expressly identified" the claimant's psychological conditions and relied on reports from two doctors, one doctor who opined on the claimant's physical restrictions and another who opined on his psychological restrictions. *Id.* at ¶ 30. The Court found that the staff hearing officer's "reliance on those two reports necessarily shows—at the very least, implicitly—that she considered [the claimant's] physical *and* psychological conditions." (Emphasis in original.) *Id.* at ¶ 28. The Court found that under the facts of the case, there was "sufficient assurance" that the staff

hearing officer "considered [the claimant's] psychological conditions in combination with his physical conditions in reaching her ultimate decision." *Id.* at ¶ 30.

{¶ 52} The Court found that none of the reasons cited by this court supported vacating the staff hearing officer's order and issuing a new one. Despite the fact that the staff hearing officer's order identified some, but not all, of the work restrictions identified in the psychological specialist's report, the Court relied on the boilerplate[1] statement in the staff hearing officer's order that " '[a]ll of the evidence was reviewed and considered in rendering th[e] decision.' " (Brackets in original.) *Id.* at ¶ 35. Given "presumptions of regularity and of consideration of all the evidence," the Court accepted the staff hearing officer's statement and explicitly refrained from "speculat[ing] as to why [the staff hearing officer] did not recite each restriction identified in [the psychological specialist's] report." *Id.* As a result, the Court reversed this court's judgment and denied the writ.

{¶ 53} In this case, Fought acknowledges that the commission relied upon the reports of its specialists—Drs. Onamusi, Shuman, and Ravin. Yet, Fought argues that the staff hearing officer "did not elaborate on how Fought's psychological conditions would affect his physical work limitations." (Fought's Brief at 15.) Fought further contends that the staff hearing officer failed to "indicate how Dr. Shuman's limitations (fatigue, 30-hour work week, not [sic] interaction with public and rest breaks) are considered" in denying the application. *Id.* Fought asserts the staff hearing officer's conclusion runs afoul of Adm.Code 4121-3-34(D)(3)(i) by failing to acknowledge the psychological limitations set forth by Dr. Shuman. These arguments parallel those made by the claimant and rejected by the Supreme Court of Ohio in *Urban*.

{¶ 54} The staff hearing officer's order in this matter identified Fought's allowed physical and psychological conditions, reviewed the history of Fought's claim and treatment, and then summarized the reports of the commission's specialists. With regard to the allowed physical conditions, the staff hearing officer summarized the reports of Drs. Onamusi and Ravin. The staff hearing officer noted Dr. Ravin's opinion that Fought

---

[1] *See State ex rel. Donohoe v. Indus. Comm.*, 2011-Ohio-5798, ¶ 17 (affirming this court's decision to return a matter to the commission for clarification and consideration of all evidence because, despite a boilerplate statement that " 'all evidence was reviewed and considered,' . . . other language in the order cast doubt on the true extent of evidentiary review," and stating that "[a]n order that can engender two viable, yet irreconcilable, interpretations is too ambiguous to withstand scrutiny").

had reached maximum medical improvement and had no work limitations related to the reviewed allowed physical condition of right eye reflex sympathetic dystrophy. As to Dr. Onamusi's report, which addressed the remaining allowed physical conditions, the staff hearing officer noted Dr. Onamusi's opinion that Fought had reached maximum medical improvement and was able to return to work, with the restriction that such work be within the physical demand category of light work.

{¶ 55} The staff hearing officer also addressed Dr. Shuman's report on Fought's allowed psychological condition. The staff hearing officer summarized some of Dr. Shuman's findings, including with regard to the four functional areas. For example, the staff hearing officer noted Dr. Shuman's finding that Fought's "activities of daily living, social functioning, and persistence, pace and concentration were mildly impaired." (Stip. at 110.) Additionally, the staff hearing officer's order reflects Dr. Shuman's finding that Fought had "reached maximum medical improvement for the allowed psychological condition" and had "a 23 percent whole person impairment, based solely on the allowed psychological condition." *Id.* Furthermore, the staff hearing officer recited each of the limitations imposed by Dr. Shuman as follows: "Dr. Shuman indicated [Fought] was capable of working six hours per day, five days per week, no direct contact with customers due to irritability, and in a position that allowed extra breaks when suffering from pain related to the allowed conditions." *Id.* Immediately following the summaries of the specialists' reports, the staff hearing officer stated that "Doctors Onamusi, Shuman and Ravin are found persuasive [Fought] is at maximum medical improvement for all the allowed conditions." (Stip. at 110.) Next, the staff hearing officer stated: "Drs. Onamusi and Shuman are found persuasive [Fought] is unable to return to his former position of employment due to residuals from the industrial accident. Further, they are found persuasive [Fought] could potentially return to work within his restrictions." *Id.*

{¶ 56} As in *Urban*, the staff hearing officer's "reliance on [these] reports necessarily shows—at the very least, implicitly—that [the staff hearing officer] considered [the] physical *and* psychological conditions." (Emphasis in original.) *Urban*, 2025-Ohio-3009, ¶ 28. The staff hearing officer identified Fought's physical and psychological conditions and relied on reports opining on both the physical and psychological restrictions. "These facts

provide sufficient assurance that the [staff hearing officer] considered [the] psychological condition[] in combination with [the] physical conditions in reaching [the] ultimate decision" that Fought's permanent total disability application should be denied. *Id*. at ¶ 30. Moreover, unlike in *Urban*, in which the staff hearing officer's order failed to identify all of the psychological restrictions imposed by the psychological specialist, the staff hearing officer's order in this case identified all of the psychological limitations imposed by Dr. Shuman. This is consistent with the principle that the "commission is required only to specify the evidence it relied on and to briefly explain the reasoning for its decision." *Id*. at ¶ 34.

{¶ 57} Therefore, consistent with *Urban*, the staff hearing officer in this matter complied with Adm.Code 4121-3-34(D)(3)(i) by considering whether the allowed psychological condition in combination with the allowed physical conditions prevented Fought from engaging in sustained remunerative employment. Fought has not demonstrated the commission abused its discretion in its determination of his residual functional capacity in light of both his physical and psychological limitations.

{¶ 58} Second, Fought contends the commission failed to cite some evidence for its holding there is no vocational preclusion to retraining or skills enhancement to increase Fought's vocational potential. Fought argues that the March 16, 2023 functional capacity report contradicts the staff hearing officer's finding that Fought is a candidate for vocational rehabilitation.

{¶ 59} In the October 14, 2023 staff hearing officer order finding closure of the vocational rehabilitation services file to be appropriate, the staff hearing officer found the June 27, 2023 peer review report issued by Calhoun to be persuasive. The staff hearing officer found there was sufficient persuasive evidence to establish that vocational rehabilitation services were not feasible for Fought. The staff hearing officer further found there was not a reasonable probability that such services would result in Fought returning to work.

{¶ 60} In the July 9, 2024 order denying Fought's application for permanent total disability compensation, the staff hearing officer summarized Fought's history with vocational rehabilitation services. The staff hearing officer noted the October 14, 2023 order finding vocational rehabilitation services were "not feasible based upon the opinion

by Rita Calhoun, MA, CRC, set forth in her report dated [June 27, 2023] and the Functional Capacity Evaluation report, dated [March 16, 2023]." (Stip. at 112.) After reviewing the medical and nonmedical factors, the staff hearing officer ultimately found there was sufficient persuasive evidence to support that Fought possessed "the physical capacity to return to light level employment," finding Fought's "education and work history [were] assets rather than barriers to performing work at a light level." *Id.* at 113. Immediately after this finding, the staff hearing officer found there was "no vocational preclusion to re-training or skills enhancement to increase [Fought's] vocational potential." *Id.*

{¶ 61} Thus, Fought is correct in noting that in October 2023, the commission had found vocational rehabilitation services were not feasible for Fought because there was not a reasonable probability that such services would result in Fought returning to work. However, Fought does not explain why the commission could not reach a different conclusion in July 2024 based on the evidence presented with regard to Fought's application for permanent total disability compensation. And, indeed, some evidence and sufficient analysis supports the staff hearing officer's findings regarding Fought's "vocational potential" in the July 9, 2024 order.

{¶ 62} Following a review of the medical evidence relied upon in the commission's specialists' reports, the staff hearing officer engaged in a lengthy discussion of the nonmedical factors relevant to Fought's claim. The staff hearing officer made factual findings regarding Fought's age, educational history, employment history, and the results of the bureau's special investigations department report.

{¶ 63} Weighing the nonmedical factors, the staff hearing officer found Fought's age was a positive factor based on a determination that Fought had "many productive years during which he could be involved in sustained remunerative employment, even on a part-time basis." (Stip. at 112.) More importantly, with regard to education, which was found to be a neutral factor, the staff hearing officer found Fought had "sufficient basic skills for entry level employment and the capacity to acquire new job skills either through retraining or on-the job training." *Id.* The staff hearing officer also noted Fought's communication skills based on his previous employment in a supervisory capacity and evidence obtained from the bureau's special investigations department report that, in the staff hearing officer's opinion, "demonstrated [Fought's] responsiveness to others and his ability to relay

information." *Id.* With regard to Fought's employment history, which was determined to be a neutral factor, the staff hearing officer found based on Fought's prior employment in supervisory positions that he "would have developed skills to help others gain knowledge and learn new things." *Id.* at 113.

{¶ 64} Furthermore, the staff hearing officer considered the report of the bureau's special investigations department, which was completed after the October 14, 2023 staff hearing officer order finding vocational rehabilitation services were not feasible for Fought. The staff hearing officer found that found the evidence regarding Fought's activities presented in the bureau's special investigations department report was inconsistent with Fought's statements to the commission's specialists and Fought's testimony at the permanent total disability hearing.

{¶ 65} The commission is the expert on vocational evidence and possesses the discretion to accept or reject a vocational report. *See State ex rel. Lacroix v. Indus. Comm.*, 2015-Ohio-2313, ¶ 14 (stating that "the commission, as the exclusive evaluator of disability, is not required to accept vocational evidence, even if uncontroverted"); *State ex rel. Jackson v. Indus. Comm.*, 1997-Ohio-152, ¶ 14 ("The commission may credit offered vocational evidence, but expert opinion is not critical or even necessary, because the commission *is* the expert on this issue." (Emphasis in original.)). The commission is also the "exclusive evaluator of the weight and credibility of the evidence." *State ex rel. Neitzelt v. Indus. Comm.*, 2020-Ohio-1453, ¶ 10. Though Fought takes issue with the evidence cited by the staff hearing officer, particularly the findings regarding the bureau's special investigations department report in light of Fought's complex regional pain syndrome symptoms, these disputes merely challenge the weight of the evidence. Whether this court would reach a different conclusion in weighing the evidence is a question outside of the scope of review in mandamus. *See State ex rel. Certified Oil Corp. v. Mabe*, 2007-Ohio-3877, ¶ 4 (10th Dist.), citing *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987). In sum, Fought has not demonstrated the commission abused its discretion in making its findings regarding Fought's "vocational potential" since some evidence supported those findings.

## D. Conclusion

{¶ 66} For the foregoing reasons, Fought has not demonstrated a clear legal right to the requested relief and a clear legal duty on the part of the commission to provide it. Accordingly, it is the decision and recommendation of the magistrate that Fought's request for a writ of mandamus should be denied.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.